## STANLEY WORKS et al. v. C. S. MERSICK CO.

No. 2707.

District Court, D. Connecticut.

Sept. 6, 1940

914

Watrous, Hewitt, Gumbart & Corbin, by James W. Cooper, all of New Haven, Conn. (Robert S. Allyn and H. R. Johns, both of New York City, of counsel), for plaintiff.

Rockwell & Bartholow, by Henry E. Rockwell, all of New Haven, Conn., and Samuels & Clark, by Edwin F. Samuels, all of Baltimore, Md. (Leon Edelson, of Philadelphia, Pa., of counsel), for defendant.

HINCKS, District Judge.

This is an infringement suit raising issues of validity and infringement.

### Findings of Fact

1. Plaintiff herein, The Stanley Works, is a corporation of Connecticut, and the plaintiff, Andre Gueneau, is a citizen of France residing in Paris, France.

2. Defendant herein, The C. S. Mersick & Company, is a corporation of Connecticut having a place of business in New Haven, Connecticut, where it has sold a certain sheet metal cutting tool charged to infringe the patents in suit, these tools having been manufactured by the Black & Decker Manufacturing Company, a Maryland corporation, the defense of this suit being conducted by the latter company.

3. The complaint alleges infringement of United States reissue patent No. 17,139 to Vulliet and Deschartres, dated November 20, 1928, filed October 25, 1927, the original being No. 1,493,171, dated May 6, 1924, filed November 2, 1922; patent to Steindorff No. 1,796,812, filed October 26, 1925, dated March 17, 1931; and patent to Ungar No. 1,848,147, filed October 20, 1927, dated March 8, 1932, three patents formerly included having been withdrawn shortly prior to trial, namely, Ungar patent No. 1,843,655; Ungar patent No. 1,765,-317; and Steindorff patent No. 1,775,787.

4. The patents in suit relate to throatless shears for cutting sheet metal.

5. Both the plaintiff, The Stanley Works, and the Black & Decker Manufacturing Company, which is defending on behalf of The C. S. Mersick & Company, Exhibit E, are manufacturers of portable electric tools and the competing products of plaintiff, The Stanley Works, and of defendant, in evidence in this case, are portable, hand-held, throatless shears driven by small electric motors.

6. The sale within this District of defendant's shear, Exhibit D, which is the subject of complaint, is admitted by stipulation.

7. The claims now in suit are as follows:

*Vulliet Reissue Patent No. 17,139 (Claim 15)*

"15. An automatic shears for cutting sheet metal, comprising a pair of fixed and movable overlapping, cutting blades having their cutting edges forming an acute angle, a carrier for the movable blade, means for giving to said carrier a reciprocatory movement of such small amplitude as to cause only a short intermediate part of the cutting edge of the movable blade to cross and recross the cutting edge of the fixed blade, and a rigid frame formed to provide a guideway embracing the carrier of the movable blade and a rigid support for the fixed blade and to provide guiding means with clearance space extending rearwardly and outwardly from the apex of the angle formed by the cutting edges of the blades to permit relative turning of the blades and the sheet metal during the operation of the movable blade."

*Steindorff Patent No. 1,796,812 (Claim 12)*

"12. In a shears, a shear head comprising a bracket, and an anvil detachably secured thereto, a movable cutting blade carried by said bracket, and a stationary cutting blade carried by said anvil, said anvil being provided with an upper work supporting and a lower work guiding surface extending rearwardly of, and one on each side of, said cutting blades."

*Ungar Patent No. 1,848,147 (Claim 8)*

"8. In a shears, of the type wherein a movable cutting blade and a stationary cutting blade have their cutting edges inclined at an angle to provide an open throat to which the work may be fed continuously, and a motor and actuating mechanism connected with said motor and said movable blade imparts a rapid stroke of small amplitude to said movable blade; a stationary blade carrier detachably associated with said motor, said blade carrier having a boss, a clamping member cooperating with said boss for securing said blade carrier to the shears, said boss having a substantially vertical curved face terminating at one end adjacent to the intersection of said cutting blades and curving away from the vertical plane in which said intersection is located, and said carrier being further provided with a work supporting surface extending substantially in parallelism with the cutting edge of said stationary blade, a second curved face located below said work supporting surface, terminating at one end adjacent to said intersection and curving away from said plane in a direction opposite to said first named curved face, and a lower surface located substantially in parallelism with the cutting edge of said movable blade."

8. The Vulliet reissue, No. 17,139, in addition to the claims of the original Vulliet, included additional claims of which only No. 15, quoted in Paragraph 7 above, is here in issue. It is agreed that claim 15 and indeed the other new claims of the reissue are broader than any of the original claims; also that all the structural elements of claim 15, individually considered were old in the prior art.

9. The plaintiff Gueneau, as assignee of the original Vulliet and Deschartres No. 1,493,171 (issued May 6, 1924), licensed Achard et Cie, a French firm, to manufacture. Early in 1925, Achard's product under the Vulliet patent, exemplified in a machine (Exhibit 1) known as the "Monobloc", came to the attention in this country of Messrs. Heller and Steindorff, predecessors of Unishear Company, Inc. (hereinafter referred to as Unishear), who desired to become American representatives for machines made under the Vulliet patent. Thereupon Unishear succeeded in negotiating from Achard a license to sell, but not to manufacture, the Vulliet machines in the United States, and by July 29, 1925, believing that a broader patent protection was desirable and feasible, had obtained the signature of Gueneau, the assignee, and of Deschartres, one of the two co-inventors, to the application for the reissue. Vulliet, the other co-inventor, then declined to join in the application for reissue, ostensibly because of his belief that the original "represents exactly the essence of our invention

and I do not see the necessity for change" and actually out of hope for further compensation. An application for reissue by Gueneau was made and refused on August 4, 1925, for lack of Vulliet's signature. Thereupon legal proceedings were instituted and prosecuted against Vulliet in France with due diligence as a result of which he signed the application for reissue on May 3, 1927.

10. In the meantime Unishear sold the imported French shears (Monobloc), but, finding it difficult to obtain from Achard prompt deliveries of satisfactory quality, in 1925 began without license to manufacture and sell a tool (the prototype of what was later the Unishear A–14, Exhibit J), similar to the Vulliet Monobloc. At least 500 of these A–14 tools were made and sold by Unishear without license prior to July 22, 1927. A suit was brought by Gueneau against Unishear on July 22, 1927, charging that the manufacture and sale of the Unishear A–14 constituted an infringement of the original Vulliet patent. This suit was withdrawn without prejudice on October 24, 1927, upon an agreement of settlement whereby Unishear received a license to manufacture and sell its A–14 tool. The application for reissue was filed on October 25, 1927, the day following the settlement of said suit for infringement.

11. The original Vulliet patent was "inoperative * * * by reason of a defective or insufficient specification" within the meaning of R.S. § 4916, 35 U.S.C.A. § 64, only in the sense that the inventors by inadvertence failed to realize that the disclosure of the patent was adequate to support broader claims than those originally stated. This inadvertence was first called to the attention of the inventors and their assignee by their American licensee in the summer of 1925, as set forth in Paragraph 9 above.

12. During the summer of 1927, Unishear put upon the market its Mighty Midget (Exhibit F) and sold the same prior to the filing of the application for the Vulliet reissue. The Mighty Midget, unlike the Monobloc and the Unishear A–14 both of which were bench tools, was a hand-supported tool which, without infringing the original Vulliet, did embody the invention of claim 15 of the reissue.

13. In October, 1929, Unishear sold out its entire business to the plaintiff, and as a part of said sale assigned to the plaintiff, The Stanley Works, the Steindorff and Ungar patents in suit and jointly with Achard granted the plaintiff an exclusive license on a royalty basis to make and sell in the United States tools covered by the original Vulliet and the Vulliet reissue. Achard, the original licensee under Vulliet, later released to Gueneau who as patent assignee confirmed the license in The Stanley Works. (Plaintiffs' title to patents in suit, though not admitted, was not disputed.)

14. The shear-head disclosed by Vulliet comprised a frame (a), generally channel-shaped, the side walls of which (being integral with the "floor" of the channeled frame) Vulliet refers to as cheeks $c^1$ and $c^2$. The movable blade carrier is a plate reciprocating between these cheeks which serve as guides to prevent the wobbling or lateral displacement of the movable blade. The lower part of the channeled frame flares outwardly (rearwardly from the intersection of the blades), the flared portion being solid, and from this solid flare and integral therewith is a lateral projection which constitutes a combined stationary blade carrier and anvil (L). This stationary blade carrier extends forward from the solid flare part of the frame (with which it is integral) and carries at its forward end a stationary blade for cooperation with the blade on the movable blade carrier which reciprocates in the channeled frame just in advance of the solid flared portion at its bottom rear.

The cheek of the frame above the stationary blade carrier is slotted, the floor of the slot, M, being a horizontal surface passing through the cutting edge of the stationary blade, which serves to support the sheet metal as it passes beyond the blades. The outside of the slot is open, and the inside has as a sidewall a vertical face curving away from the vertical plane passing through the intersection of the blades. This curved face serves to limit the curve which can be cut in stiff metal. This slot with its planar floor and vertical curved sidewall accommodate the metal on one side of the cut.

The metal on the other side of the cut, after passing the blades, will deflect against the bottom of the solid flared portion of the frame and thence slide along the planar surface of the bottom of the flare which extends downwardly at an angle in-

dicated by K in Figure 4. And the inside wall of the anvil, which is substantially a vertical plane, curves in the opposite direction to the curve of the slot M to permit of a corresponding curve in the cut of the metal.

15. In Vulliet, the inclined plane K forms an offset wedge with the horizontal work surface on the top of the anvil. The point of the wedge is just in rear of the intersection of the blades and serves to separate the two strips of metal on either side of the cut. This feature, and the offset anvil, were inherent in the French Monobloc, which is prior art as to the Steindorff and Ungar patents in suit; indeed, it was well-known long prior to Vulliet. Exhibit 5M is a McSherry hand-operated shear purchased in 1907, and in use ever since. It discloses not only the offset wedge and anvil but also the curved vertical planes limiting the minimum radius of the curves which can be cut on the tool.

16. The only essential modification of Steindorff over Vulliet with respect to the shear-head (with which alone claim 12 of Steindorff is concerned) was to split the Vulliet frame longitudinally in a vertical plane defined by the bearing surfaces of the blades and then bolt together the severed parts, one of which, in a single integral piece, comprised in Vulliet (a) the side-plate or cheek piece serving as a guideway for the movable blade carrier, and (b) a lateral projection on the inside of said cheek piece which flares downwardly and outwardly into the offset anvil.

17. The only essential modification of Ungar over Vulliet, so far as pertinent to Ungar claim 8, was to split the Vulliet frame in a horizontal plane passing through the frame along the line of the top of the slot marked M on the Vulliet drawings, and then bolt together the severed parts.

18. Defendant's tool, Exhibit D, charged with infringement, has a combination anvil and fixed blade carrier which is integral with a tubular housing for the movable blade carrier. As a result the defendant's anvil and fixed blade carrier is supported, not merely rearwardly of the intersection of the blades as in the three patents in suit but also on the outside and front as well. This arrangement permits of a stronger support for the fixed blade carrier and anvil with a lesser mass of metal disposed rearwardly of the intersection of the blades and because of the lesser mass of metal to the rear of the blades the clearance is correspondingly increased permitting the cutting of sharper curves in stiff metal sheet.

### Conclusions of Law

19. Vulliet reissue No. 17,139 is not invalid in that the narrower claims of the original Vulliet proceeded from the deliberate intention of the inventors, rather than from an "inadvertence, accident, or mistake" as required by the statute, R.S. § 4916, 35 U.S.C.A. § 64, as a condition to a lawful reissue.

### Comment

The finding by the Patent Office makes out a prima facie case of "inadvertence". American Automotoneer Co. v. Porter, 6 Cir., 232 F. 456. Here the broader claims of the reissue had never been rejected or abandoned in connection with the application for the reissue; nor are there other facts here of record which "conclusively show that the error [i. e., the failure originally to state claims as broad as the disclosed invention would permit] was not inadvertent." Id., 232 F. page 460; H. W. Roos Co. v. McMillan, 6 Cir., 64 F.2d 568; Tulchin v. Perey Mfg. Co., 2 Cir., 87 F.2d 302.

Vulliet's representation, as reported in Paragraph 9 above, that the original "represents exactly the essence of our invention", is not inconsistent with the foregoing. The representation, if sincere rather than a pretext to exact further compensation from the assignee, in view of the obvious fact that the original claims were not as broad as the disclosure permitted demonstrates not the absence, but rather the persistence, of the inadvertence.

20. Claim 15 of Vulliet reissue No. 17,139 was not invalid because claiming an invention not included within the scope of the disclosure of the original Vulliet No. 1,493,171.

### Comment

The reissue expressly specifies that the reciprocatory movement of the movable blade shall be one of such small amplitude as to make only a short cut at each stroke. And the defendant has contended that the reissue is invalid in that this feature was not a part of the original disclosure. In this connection the defendant points to page

3, line 37 of the original specifications where a "short blade" is called for, and correctly argues that a short blade is not the same as a short cut.

But the defendant's contention must be overruled. For on page 1, line 73, of the original Vulliet patent it is stated that the reciprocatory movement is such "that the movement of relative displacement of the tool and of the material to be cut is small." Moreover, the original specifications expressly contemplate the "turning of the tool in both directions in very small radii" for cutting on curved lines. But obviously in a reciprocatory tool sharp curves can be cut only if the cut accomplished by each reciprocatory movement is short. Altogether it is sufficiently clear that the original disclosure included the feature of the short cut.

21. Claim 15 of the Vulliet Reissue No. 17,139 is invalid because of the laches of the patentee in filing the application for the reissue.

### Comment

#### A. Delay.

Here, the "inadvertence" of the inventors appears not to have been brought to their attention until 1925—a year after the date of issue. And since the inadvertence consisted in too narrow a statement of the claims, it might be urged that the case fell within the rule of Miller v. Brass Co., 104 U.S. 350, 355, 26 L.Ed. 783, where it was said that such a "defect is apparent on the face of the patent, and can be discovered as soon as that document is taken out of its envelope and opened." And in Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 831, 36 L.Ed. 658, it was pointed out that "due diligence must be exercised in discovering the mistake in the original patent."

Under these authorities it is apparent that during the first year of the patent the assignee and inventors failed to show due diligence in discovering the insufficiency of the original claims. But since their lack of diligence in this respect continued for less than two years, under the rule of Miller v. Brass Co., supra, their negligence would not necessarily invalidate the reissue. Tulchin v. Perey Mfg. Co., supra; Worthington Pump Corp. v. Clark Bros., D.C., 17 F.2d 189; Van Kannel Revolving Door Co. v. Winton Hotel Co., 6 Cir., 276 F. 234. H. W. Roos Co. v. McMillan, supra, applies a stricter standard, but the Tulchin case affirms the prevalence of a more liberal rule in this circuit. Indeed, if failure to discover the mistake promptly upon the issue of the patent were held to preclude a reissue, there would be no occasion for the two year rule of the Miller case.

After the failure of the patent to include the broader claims had been brought to the attention of the assignee in the summer of 1925, he was engaged until May 3, 1927, in an attempt to obtain by legal proceedings the signature of Vulliet, one of the co-inventors, to the application for reissue. I have wondered whether the assignee with respect to this delay was not privy to Vulliet, the inventor and assignor, and hence equally without excuse for this delay. However, Gueneau, as assignee, had either an expressed or implied covenant from Vulliet, the inventor, to apply for the reissue. Northrop v. Draper Co., 1 Cir., 239 F. 719. And so it appears to me that when Vulliet refused to join in the application for reissue his act was in derogation of the original assignment, and the assignee was in no respect chargeable with the delay caused by the necessity for legal proceedings to compel Vulliet's cooperation. See Van Kannel Co. v. Winton Hotel Co., 6 Cir., 276 F. 234, at page 239.

But although I hold that the assignee was not chargeable with laches for the delay occasioned by Vulliet's refusal voluntarily and promptly to sign, the fact remains that on May 3, 1927, when Vulliet finally did sign under compulsion of law, three full years had expired since the issue of the original patent. Any further delay would be fatal to the reissue "in the absence of extraordinary exculpatory circumstances." Sontag Chain Stores v. National Nut Co., 310 U.S. 281, 60 S.Ct. 961, 967, 84 L.Ed. 1204. And it is well established that the court is not bound by the action of the Patent Office in passing on the sufficiency of the patentee's excuse for the delay. Topliff v. Topliff, 145 U.S. 156, at page 171, 12 S.Ct. 825, 36 L.Ed. 658; Tulchin v. Perey Mfg. Co., 2 Cir., 87 F.2d 302, at page 304; Otis Elevator Co. v. Atlantic Elevator Co., 2 Cir., 47 F.2d 545.

The only evidence of excuse for the delay during this final period lies (a) in the affidavit of the assignee and patentee in the file wrapper and (b) in a possible inference from the fact that the application for reissue was filed on the day after the settle-

ment of the infringement case, that the delay was caused by the pendency of the infringement suit as urged by plaintiff's counsel on trial. On this issue, I should apprehend that statements contained in the file wrapper constituted hearsay, but since the file wrapper was offered by the defendant without limitation, I pass the question of admissibility and turn to a consideration of the substance of the excuse.

The patentee swears (file wrapper, page 75) that the delay subsequent to May 3, 1927, was occasioned by the necessity for *attaching to the reissue* copies of the proceedings in France showing the necessity for protracted legal action there to compel Vulliet to sign the application. But no explanation is offered for the necessity for attaching these copies to the application; certainly the file wrapper fails to show that the copies had been required by the Patent Office; for aught that appears the application could have been promptly filed, accompanied if desired by the patentee's affidavit (the file wrapper, page 35, shows such an affidavit dated July 28, 1927, and contains no intimation that the affidavit was insufficient in the absence of the official copies) and the official copies could have been added to the Patent Office file at a later date, if eventually required.

The patentee further swears (page 75) that he made request on the French authorities for the desired copies on June 22, 1927, and made reminder of his request on July 21, 1927, and that the copies were received (the exact date not specified) subsequent to the latter date. If, indeed, the copies were a *prerequisite to filing*, surely this is not enough to show that due diligence could not have accomplished a filing earlier than in October.

Apparently plaintiff's counsel considered these file-wrapper excuses inadequate; for on trial he urged the pendency of the infringement suit as the excuse for the delay (although the patentee in his affidavits made no mention of the infringement suit). And there are, indeed, a number of cases in which the pendency of infringement suits on the original patent has been held to justify delay, even beyond the two year period, in applying for a reissue. Van Kannel v. Winton Hotel Co., supra; Ashley v. Samuel C. Tatum Co., D.C., 240 F. 979; Gross v. Norris, D.C., 18 F.2d 418. But apparently these authorities were concerned with infringement cases in which the facts

and the issues were such that their disposition might obviate the need for applying for the reissues there in question; they do not hold broadly that every patentee, and especially one who for two years has intended to apply for a reissue, by bringing an infringement suit can extend the time for filing an application for reissue beyond the two year period of the rule in the Miller case and keep the time for filing open during the pendency of protracted litigation on the original patent.

■ Here, there is nothing in the record to show that any possible disposition of the infringement suit against Unishear would have obviated the patentee's need for a reissue. Surely the patentee did not file his infringement suit in the expectation that the original Vulliet patent would be invalidated. And if the patent should have been sustained, a finding on the alleged infringement of Unishear's A–14 tool—a bench tool with elliptical reciprocation— could not possibly have demonstrated the sufficiency of the original patent to afford protection against a handheld tool with straight-line reciprocation like the tool of the defendant now charged to infringe the reissue. Thus, to afford the patentee all possible protection the reissue was necessary irrespective of the outcome of litigation involving only the A–14 tool, and I find no excuse for the delay of almost six months which followed Vulliet's signature to the application for reissue—certainly no "extraordinary exculpatory circumstances" excusing the delay. Thus, even in a complete absence of any intervening rights, I should feel that the defense of laches had been sustained.

### B. Intervening Rights

■ But in fact the defense of laches is substantially fortified by a showing of intervening rights. Paragraph 12, supra.

To be sure, Unishear after selling its Mighty Midget in the summer of 1927, two years later sold out to the plaintiff, The Stanley Works. And the defendant in the manufacture and sale of its devices claims neither through Unishear nor, so far as the record shows, through any other party who exercised rights covered by the broadened claims during the intervening period. Nevertheless, the fact remains that Unishear in its manufacture and sale of the Mighty Midget as a member of the public exercised a right which had been ap-

parently dedicated to the public by the original Vulliet patent. Likewise all the purchasers of Mighty Midgets during the intervening period. If the patentee had acted diligently his application for reissue might have been in before these rights had been exercised in the summer of 1927. The delay which permitted these rights to mature in the intervening period before the application for the reissue must be held to demonstrate laches on the part of the patentee even though the defendant here, not having developed and produced its competing device until long after the intervening period is in no position to claim a personal estoppel against the patentee and his assignee. Otis Elevator Co. **v.** Atlantic Elevator Co., supra.

I do not overlook the holding in the recent Sontag case that the defendant there acted with implied knowledge of the original patent and hence might "justly claim whatever privileges would follow actual knowledge." This observation, however, I do not construe as impliedly overruling the doctrine of the Otis Elevator case; rather it indicates only that the Court on the facts then before it found it unnecessary to go so far as to hold that intervening rights might demonstrate the presence of laches even in the absence of a personal estoppel.

It is true, as plaintiff contends, that the Unishear Mighty Midget was developed and put upon the market wholly without reliance upon any dedication to the public in the original patent; also that shortly thereafter Unishear sold out to the plaintiff, The Stanley Works, which became a licensee under the Vulliet reissue. But the controlling fact remains: prior to the application for the reissue the art had progressed; the public was entitled to the benefit of that progress; and it matters nothing that this particular defendant was a late comer in the field. Otis Elevator Co. v. Atlantic Elevator Co., supra.

Tulchin v. Perey Mfg. Co., supra, is not essentially at variance with this conclusion. There the only evidence of an intervening development in the art was confined to an experiment made by the defendant with the assistance of an explanation of the invention made by the patentee himself. Here the development transcended the stage of experiment and was accomplished not by the patentee or his assignee but by Unishear which though then a sales agent of the patentee was as much at liberty to develop the art as any stranger. And in the Tulchin case the reissue was applied for within the two year period, if that be important.

22. The conclusion just above expressed makes it unnecessary to pass upon the numerous other defenses to the Vulliet reissue raised by the defendant.

### Comment

I think I ought, however, to express my view that there is decided substance to the defense of non-infringement. I am not so much impressed by the defendant's contention that the reissue should be construed to cover only tools with a self-feeding device as I am by the novelty of the defendant's tubular housing for the movable carrier blade. To be sure, in so far as this housing serves as the guide for the reciprocating movable blade carrier it might, conceivably, be deemed the equivalent of Vulliet's planar cheek pieces which prevent the lateral displacement of that carrier. But the defendant's tubular housing does more; it serves also as a support for the fixed blade carrier and anvil with which it is integral in a manner not disclosed, I think, by Vulliet or the prior art.

For the prior art, in so far as it utilizes the offset anvil feature disclosed by Vulliet, shows a history in the refinement of design. Thus the old McSherry hand-operated bench shear (Exhibit 5M) shows the curved vertical planes which serve to limit the minimum radius of any curves that can be cut. But in this device the curve of the vertical planes is so slight that curves of small radius were outside the capacity of the tool. The McSherry hand-shear (Exhibit M) shows an example of more sharply curved vertical planes permitting of sharper curves. Even in the Monobloc, the curve of the vertical planes was so slight as seriously to limit the degree of curve. In the A–14 tool and the plaintiff's present commercial product, due quite possibly to the availability of harder steel, the fixed blade carrier containing the vertical curved walls was progressively reduced thus permitting of somewhat sharper curves. But all utilize the offset anvil design wherein the entire support for the fixed blade carrier is wholly located in the frame rearwardly of the intersection of the blades. As a

result it appears to be impossible to curve more sharply the vertical walls limiting the curve of the cut without serious detriment to the strength of the structure.

But the defendant, by surrounding the movable blade on the front and side as well as to the rear with its tubular housing, has contrived a support for the anvil (which is integral with the housing) so disposed that it has been mechanically possible substantially to reduce the mass of supporting metal which Vulliet discloses to the rear of the intersection of the blades. This arrangement has made it possible substantially to decrease the minimum radius of permissible curves over Vulliet and the plaintiff's commercial structure.

Thus I have grave doubt whether claim 15 of the Vulliet reissue, in so far as it specifies "a rigid frame formed to provide * * * a rigid support for the fixed blade and to provide guiding means with clearance space extending rearwardly, etc.", can be construed to cover the defendant's arrangement for the support of the fixed blade carrier with its improved clearance space when Vulliet's specifications, and I think the prior art as well, contained no inkling of the defendant's improved arrangement.

■ 23. Claim 12 of Steindorff and Heller No. 1,796,812 is void for lack of patentable invention.

### Comment

As against this patent, the Vulliet reissue is prior art.

My finding, stated in Paragraph 16, supra, can be easily verified by an inspection of Exhibit 17, a wooden model of the Vulliet reissue. Take a rear view of this model (which will put the crank of the model on the left). With the frame split in the vertical plane, defined as in Paragraph 16, the part of the frame on the left ($c^1$) is the equivalent of Steindorff's bracket 11 plus his cover plate 18 (which must be deemed a part of Steindorff's shear-head since it intervenes between his bracket and his "combined stationary blade carrier and anvil" 28 and furnishes an indispensable guideway for his movable blade carrier). And the part of the frame ($c^2$) on the right of the split will comprise the equivalent of Steindorff's side plate 28 (which serves also both to house and guide the movable blade carrier and

to support the fixed blade carrier) with its flange 34 bearing on the cover plate 18 which is bolted to the bracket 11.

The handle, $b^2$, on the Vulliet reissue (which obviously was shown for purposes of a hand-held tool) is the equivalent of the base portion 10 which supports Steindorff's bracket standard. The other handle of Vulliet, $b^1$, Steindorff has eliminated as unnecessary in his bench type of machine.

That a modification so simple did not require patentable invention is a conclusion too plain to require the citation of authorities. It being deemed useful to make the anvil detachable, it lay wholly in the field of mechanical design to determine where to sever the anvil and how to attach it.

To be sure, this modification of Vulliet would not provide the complete housing and oil reservoir which Steindorff provided by his side-plate 28 with its flange 34 extended to enclose the movable blade carrier in front as well as in back. But nothing beyond the simple modification described was required to produce a flange, corresponding to Steindorff's flange 34, on the back side of the Vulliet tool. If it was desired to provide an oil chamber in which the movable blade carrier might reciprocate, it would scarcely require invention to extend that flange so that the movable blade carrier should be completely enclosed, as in Steindorff.

However that may be, claim 12 of Steindorff is expressly confined to the shear-head and does not cover either the means which produce reciprocation or the housing of such means. These elements and subcombinations are stated in other claims. Claim 4, for example, defines the "second oil reservoir" formed by the cover plate 18 on one side, and by the side plate 28 (with its flange 34) constituting the remainder of the enclosure forming said oil reservoir. If, as I hold, Steindorff's *shear-head* discloses no patentable improvement over the Vulliet *shear-head,* claim 12 which is confined to a shear-head cannot derive validity from improvements which the patentee has not treated as parts of the shear-head.

Indeed, if, in an effort to save its validity, I were to construe claim 12 to include all the parts of Steindorff's disclosure which are enclosed between his bracket and his stationary blade carrier 28, a finding of

non-infringement would be required. For instance, Steindorff disclosed only elliptical reciprocation; the defendant's device is so constructed as to utilize only straight-line reciprocation.

I have felt constrained to construe the "shear-head" of the claim as including the cover plate 18, although the cover plate is not expressly stated as an element of claim 12. This construction is required to satisfy the language of claim 12 that the anvil is "detachably secured *thereto*." The specifications show that the anvil is bolted to the cover plate; thus necessarily the cover plate must be treated as a part of the shear-head. Indeed, without the cover plate the movable carrier blade is left without a guideway with the result that the claim no more states a patentable combination than a hat on a peg or the famous eraser on the end of a pencil.

██ 24. Claim 8 of Ungar No. 1,848,147 is void for lack of patentable invention.

### Comment

The plaintiff has sought to support the validity of this claim not on the basis of any new operating results obtained from a new arrangement of parts all concededly old in the art, but rather upon the ground that the disclosed arrangement for detaching and replacing the combined fixed blade carrier and anvil infuses the complete combination with patentable novelty and invention. Thus on the trial brief, plaintiffs say: "Claim 8 is directed to specific narrow structural details, a boss which provides the guiding surfaces, clamping means which secures the blade carrier, the lower guiding surface being about in parallelism with the edge of the movable cutting blade." More specifically, the gist of the claimed invention seems to be the inclusion in the combination of the so-called boss on a detachable stationary blade carrier (which also carries the anvil), the top surface of the boss bearing on the casing (to which it may be affixed by a tapered nut and bolt), and the side wall of the boss being positioned when the tool is fully assembled slightly to the rear of the intersection of the blades and to one side thereof, where it serves to limit the radius of the curve of sheet metal passing through the tool.

In our consideration of the Steindorff patent we saw, with the aid of Exhibit 17, how the anvil had been made detachable by splitting the Vulliet frame along a vertical plane. This separation, however, left the anvil (and the stationary blade carrier) integral with the cheek-piece or side of the frame, $c^2$. Exhibit 19 is a model which helps us to visualize Ungar's modification of Vulliet. He simply severed the Vulliet frame in a horizontal plane passing through the frame at the top of the slot marked M on the Vulliet drawings. Looking at the lower piece thus severed from the frame, which constitutes Ungar's stationary blade carrier and anvil, the plane of severance constitutes the top surface of Ungar's so-called boss. And the floor of Vulliet's slot M (that is to say, the vertical wall curving away from the intersection of the blades) has become the side wall of Ungar's boss marked 44d in Ungar's Fig. 2. Looking at the upper piece thus severed, the plane of severance constitutes the bottom of Vulliet's frame or cheek-piece, $c^2$, which serves as side-guide for the movable blade carrier. In Ungar, when the stationary blade carrier is attached, the top of its boss bears on the casing (or a lug thereof marked 43 in Ungar's Fig. 7) which likewise serves as side-guide for the movable blade carrier.

Here, as in Steindorff, no patentable invention over Vulliet was required to make the stationary blade carrier with its offset anvil detachable; nor to provide the conventional clamping means for its assembly to the tool.

The claim states that the boss shall have "a substantially vertical curved face". This requirement had been fully disclosed by Vulliet through his slot M; the mere severance in horizontal plane of Vulliet's stationary blade carrier as above described would produce a boss which in that respect would satisfy the claim. Likewise with respect to the requirement of the claim that the "curved face" shall terminate "at one end adjacent to the intersection of said cutting blades." To be sure, the Vulliet drawings (e.g., Fig. 4) show a small space intervening between the termination of the curved face and the intersection of the cutting blades. On the Monobloc tool, Exhibit 1, which was made in conformity with the Vulliet disclosure, I roughly measure this space as one-quarter inch. But the Ungar drawings (Figs. 1 and 2) also show the presence of the intervening space, and in the Mighty Midget, the plaintiff's com-

mercial device made in accordance with the Ungar disclosure, the space measures at least one-quarter inch. And the demand of the claim that the curved face shall "curve away from the vertical plane" in which the intersection of the blades is located, was also disclosed by Vulliet. Ungar specifies that this face of the boss is "curved sharply away * * * from the vertical plane" (page 2, line 101) so that "a free and unobstructed space is provided to the rear of the cutting blades" to permit of cutting curves of small radius. Surely this specification embodies no germ of invention over Vulliet who specified that his slot M should be arranged "so as to permit of turning the tool or work * * * in very small radii" (Reissue, page 1, line 97).

Altogether, it would appear to me that Ungar's modification of Vulliet, at least with respect to the features material for present purposes, was if anything more obvious than Steindorff's modification and certainly required nothing beyond skill in machine design.

25. The conclusions expressed in Paragraphs 23 and 24 make it unnecessary to pass upon the other defenses asserted against both the Steindorff and Ungar patents.

### Comment

But here, too, I think I ought to express a view that the defense of non-infringement, whether or not sustained, has real substance. My comment under Paragraph 22 has equal application to this defense as addressed to both of the later patents. And the later patents, if valid, disclose at most an invention so small that their specifications should be narrowly construed. Their claims in suit, which are based upon the detachable feature of the fixed blade carrier and anvil, must be limited substantially to the means taught for obtaining such detachability. Thus construed, it is indeed doubtful whether the claims in suit are infringed by the defendant's device in which the fixed blade carrier and anvil are integral with the tubular housing,—an arrangement which allows the anvil to be detached only by disassembling a substantial part of the tool.

26. The complaint should be dismissed with costs to the defendant.

A decree may be submitted on notice, unless its form can be agreed upon.