SCHENK et al. v. UNITED AIRCRAFT CORPORATION.

No. 150.

District Court. D. Connecticut.

Aug. 7, 1941.

680

Cromwell, Greist & Warden, and Raymond L. Greist, all of Chicago, Ill., and Lindsey & Robillard, and T. Clay Lindsey, all of Hartford, Conn., for plaintiffs.

Cooper, Kerr & Dunham, Drury W. Cooper, and C. Blake Townsend, all of New York City, for defendant.

HINCKS, District Judge.

This is an action by the administratrix and assignee of the patentee for infringement of Schenk Reissue Patent No. 21,031, which issued March 14, 1939, on an application filed December 27, 1938. The patent in suit is a reissue of Schenk Patent No. 1,815,868, which issued July 21, 1931, on an application filed October 17, 1929. The defenses are invalidity (on a number of grounds) and noninfringement.

The patent in suit discloses a completely automatic lubricating system for air-cooled, radial engines such as are generally used in airplanes. The complete disclosure, to be sure, contains a multitude of elements and sub-combinations which were old in the art. Thus it was nothing new in the lubrication of an internal combustion engine to conduct oil, as Schenk discloses, from the main reservoir by pressure through tappet (cam follower) guides and thence through hollow push rods to a joint with the rocker arm and thence through a hollow rocker arm to a joint with a valve stem, lubricating the rocker arm bearing en route. Nor was it new to provide for the accumulation of oil in an enclosed rocker arm box containing the valve gear where it was effective to lubricate joints in the valve gear by splash.

Nor was it new in internal combustion engines,—at least in the field of automobiles in which the cylinders were arranged in banks, whether or not the banks were arranged in a V,—to drain the oil by gravity out of the rocker arm boxes through conduits in the push rod casings or shrouds to a receptacle therefor in the crank case, and thence by suction pump to the main oil reservoir for the engine. Woolson, U. S., No. 1,836,637, 1927. But such a drainage means was operable only in engines in which the cylinders projected upwardly from the crank shaft,—so that oil accumulating in the rocker arm boxes on the cylinder heads could drain by gravity back to the crank case. Such was the usual arrangement in automobile engines.

But the solution of drainage by gravity for automobile engines did not meet the problem involved in the radial engine of the airplane. For obviously in the radial engine the boxes on cylinders below the horizontal plane of the crank shaft could not drain *upward* by gravity. For such engines, it was not a practical solution to locate the main oil supply *below* the lowermost rocker arm boxes as was common practice in automobile engines. For an oil reservoir large enough to serve an airplane engine would be altogether too bulky and heavy to have such a location. And so the problem was to find a means for returning the oil from each rocker arm box to the main supply which should be sufficiently compact and reliable to be practicable in the radial airplane engine without destroying its proper balance.

The solution of the problem was a long time in coming, due apparently, to the fact that there were numerous other problems in the development of aviation even more important, which were absorbing the attention of research engineers. And after all, even under the more primitive method of hand lubrication with a grease gun an engine could run for ten hours without undue wear on its valve gear and an airplane could go a long way in ten hours,— about as far I suspect as its fuel-carrying capacity would permit. This running period could be even further extended without jeopardy to safety requirements at the risk of some wear on valve gear, and even further extended by manually-operated devices whereby the pilot could periodically inject oil to the valve gear as in the so-called "one-shot" method of lubrication. Even without automatic lubrication, Lindbergh made his historic flight to France and Wiley Post flew around the world.

Nevertheless, that automatic lubrication was an important development in the art is

fully demonstrated by the extent to which since its development it has superseded more primitive methods. The waste resulting from old methods which allowed surplus oil to escape into the atmosphere is apparent when one considers that in the modern devices for automatic lubrication something like an eighth of a pint of oil per minute is delivered at each rocker arm box. And lubrication by grease by hand was exceedingly laborious and subject to all the hazards of human fallibility. Thus the substantial utility of automatic lubrication in airplanes cannot be gainsaid.

On the record before me it appears that in radial air-cooled engines such as are commonly used for airplanes, no solution of this problem had been devised until Heron's design which was embodied in the so-called Curtiss R-1454 engine, three of which were ordered by the Government and of which at least one was delivered and tested in 1925. Although the test disclosed defects elsewhere in the engine, its system for automatic lubrication was found to be operable.

The lubrication system of the Curtiss R-1454 provided L-shaped scavenge pipes leading from each rocker arm box through an orifice in the middle of the wall of the rocker box into a circular manifold having a radius substantially less than the distance from the crank case to the top of the cylinder head. At the bottom of this circular manifold was a pipe connecting with a special suction pump which was adapted to suck oil from all the boxes and pass it on to the central reservoir in the fuselage of the plane. Thus Heron for the first time, so far as this record shows, in a radial engine achieved a closing of the circuit for oil lubricating valve gear making the system wholly automatic. It will be observed that to accomplish this, Heron relied entirely upon suction. This was especially so in respect of the cylinders whose attitude was such as to locate them below the horizontal plane passing through the crank shaft, for as to these gravity was obviously ineffective to drain the boxes on such cylinders. But even in respect of the cylinders located above that horizontal line, gravity, unaided by suction, was not wholly adequate under Heron's method. For on some of these cylinders the scavenge pipes for individual rocker boxes had an upward course at least for a part of the distance to their connection with the manifold, which only a considerable suction force could overcome.

The patentee, whose original application was filed October 17, 1929, also provided a drainage means to complete the circuit of the lubricating system; in that he followed rather than led the way. But unlike Heron, instead of providing for the evacuation of the rocker arm boxes by direct suction on each box in a single step, as it were, the patentee took two bites to the cherry; first, by providing scavenging pipes from an outlet in the lower part of each rocker box and thence extending continuously downwardly to a connection with his outer manifold through which the oil was conducted, still continuously downwardly, to a sump located between and slightly below the two lowermost rocker arm boxes, and second, by a scavenge pump only to return the oil from his sump to the central oil reservoir.

That Schenk's elaboration of Heron's means of drainage was indeed an improvement is, I think, fully demonstrated by the record. To be sure, I think the record requires a finding that Heron's apparatus was operable at least in the sense of the patent law; the 50 hour test proves that. But the 50 hour test shed little light on the efficiency of Heron's construction; it demonstrated merely operability. And Heron's own testimony shows quite clearly that in his apparatus there was one inherent defect which was eliminated by Schenk. For Heron testified that the Curtiss engine was originally equipped with scavenge pipes from each pair of boxes which formed a T with one stem only (for the pair) leading into the manifold. For this later was substituted a construction whereby each scavenge pipe led directly from its rocker box to the manifold. Heron explained this change by saying that the original construction failed to drain the boxes equally because one had more aid from gravity than the other, as was apparent from the blueprint which is Exhibit 119. But it is apparent even to a layman from the blueprint, Exhibit 120 which showed Heron's improved construction, that here too the arrangement of the scavenge pipes was such that many of them had more aid from gravity than others. And so it is scarcely surprising that Heron himself, answering a question addressed by defendant's counsel, said: "I regard the use of a sump as an improvement." One, at least, of the advantages of a dry sump is that it serves as a means to drain by gravity each rocker arm box. And a sump properly located,

like that shown by Schenk and that used by the defendant, will so drain the boxes on cylinders below as well as above the horizontal of the crank shaft.

Moreover, the defendant itself before incorporating Schenk's disclosure into its infringing engines, tried even on a commercial scale a sumpless drainage system which, like the Curtiss R-1454, depended upon direct suction on each rocker arm box. This sumpless construction was abandoned because, in the words of the defendant's own expert, Willgoos,

"We found that when we shut the engine down the oil which drained out of the rocker boxes to the bottom of the engine would build up a level sufficient to overflow the valve stems so that some of the oil would find its way down the valve guides, and if the valve on that particular cylinder happened to be open it was free to flow into the combustion chamber. And if a sufficient amount of oil collected in the combustion chamber in that manner there was danger of bending a connecting rod when you started the engine, due to excessive internal pressure in the cylinder."

This testimony that the defendant abandoned its use of Heron's means for closing the oil circuit,—an invention apparently dedicated to the public,—in favor of the patentee's improved construction is indeed highly persuasive evidence that Schenk disclosed a genuine improvement over Heron which constituted useful invention. I so hold.

■ It is next in order to consider to what extent and in what respects the invention of the disclosure has been stated in the claims which of course must be taken as the measure of any monopoly to which the patentee may be entitled. And so I pass first to a consideration of those claims of the original patent which were carried over into the reissue and are now relied on. They are 2, 3, 4, 5, 11, 14, 15 and 16.

■ None of these claims in specific terms call for a sump as an element. However, the description of the drainage features is stated in inclusive terms. Thus claim 2, for example, speaks of "means for returning oil from each chamber (meaning rocker arm box) back to the supply". In order to avoid the anticipatory effect of the Curtiss R-1454 engine, I feel that this language may properly be construed as limited to the means disclosed in the specifications and drawings, viz., pipes leading from each box downwardly to a sump adapted to drain each box by gravity. And the claims thus limited I hold to be valid.

This holding involves no conflict with the doctrine of Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008. For here the patentee's improvement over the lubrication system of the Curtiss engine went further than the improvement of one old element in the combination without change in the cooperative functions of the several elements as in the Lincoln case. The comparable sub-combination of the Curtiss R-1454 consisted simply of a suction pump between each rocker arm and the oil reservoir with the necessary pipes to each. To this Schenk added a gravity-fed sump from the boxes, from which the return oil from the valve gear is scavenged, as in the Curtiss, to the central oil supply. But the substitution of this improved sub-combination in the overall combination of the engine, as the excerpt from Willgoos' testimony quoted above indicates, accomplished the lubrication of the valve gear through a better method of cooperation between the drainage means and the other old elements and sub-combinations such as rocker arm boxes, valve guides, and combustion chambers.

It follows also that the defense of aggregation must be overruled.

### Infringement.
### Claims 2 and 3.

■ These claims state narrow combinations in which Schenk's improved method for returning the oil from the rocker arm boxes to the supply is combined with numerous other elements of the engine, all old in the art. One of these old elements is a "means for delivering lubricant under pressure to the joints between * * * the valve and rocker arm." To be sure, the inventor could as well have combined his drainage means with a means for delivering pressure oil to the push rod joint, or to the rocker arm bearing, relying on splash for the lubrication of the valve joint. But he did not do so. Instead he stated as an indispensable element in the precise combination here claimed every means which would deliver pressure oil to the valve joint.

This element is not present in the defendant's construction charged with infringement. In both Schenk and the accused devices the only joint between valve

and rocker arm is through the valve stem. And in both the valve stem comes into contact with the flat surface of a hemispherical ball set in the set screw in the rocker arm. The only difference in the rival constructions is this: in Schenk's disclosure there is an oil passage drilled through the hemispherical ball in the rocker arm screw which does indeed deliver pressure oil at the very joint of the valve, whereas in the accused devices there is no such passage through the hemispherical ball, the result being that the oil is released from pressure where it emerges from the set screw just above the hemispherical surface of the ball set therein and lubricates the joint by splash.

To be sure, the defendant's variation in respect of this element is slight; it was well known in the prior art. Nevertheless, Schenk's only just claim to invention is confined to his means for draining the boxes, and his disclosed means for delivering pressure oil at the valve stem was old in the art. It follows, therefore, that when he combined a novel feature with an old feature and claimed the old feature broadly as comprising all means adapted to accomplish a precisely stated objective (pressure oil at the valve stem) he is entitled to a very narrow range of equivalents in respect of the old element.

I must hold, therefore, that these claims are not infringed.

### Claim 4.

Here, too, the defendant claims that it avoids infringement by using a solid instead of a perforated ball in its valve joint. But in claim 4 the patentee does not specify the delivery of *pressure* lubricant at the valve joint. In this claim his only specification in this respect is the delivery of lubricant at the joint. This is broad enough to include all means known in the prior art. Consequently, it is immaterial, in respect of this claim, whether the defendant accomplishes the objective by splash or by the direct application of pressure oil.

And to this claim (as well as claim 3) an additional contention by way of defense is directed to the specification calling for "a downwardly extending drain from each casing (meaning rocker arm box)". As we have seen, Schenk disclosed a scavenge pipe leading downwardly from each box to an outer manifold which in turn conducts the drainage oil to the sump. The defendant, however, passes a downwardly extend-

ing scavenge pipe from each rocker arm box to its neighboring rocker arm box with connections from the two lower boxes which empty into the sump. Apparently the defendant's position is that for Schenk's sub-combination of scavenge pipes plus manifold it has substituted an arrangement in which the manifold, an essential element of Schenk's sub-combination, has been eliminated.

I cannot sustain this contention. In my view Schenk's scavenge pipes plus the manifold constitute not two cooperative elements in a sub-combination, but rather one integral part which drains each box, into the sump. In substituting therefor a number of scavenge pipes which connect the rocker arm boxes in series with the sump, the defendant has not eliminated any essential element but has appropriated every essential of Schenk's improvement over the Curtiss R-1454. Having discovered that a gravity drain from each box to a sump was an improvement over the Curtiss, the patentee is entitled to a range of equivalents for this feature broad enough to protect that improvement.

The defendant does not dispute that all the other elements of this claim have their counterparts in the engines charged to infringe. Such is the plain fact. I hold accordingly that claim 4 is infringed.

### Claim 5.

This claim is expressly limited to the construction specifically disclosed calling for individual scavenge pipes from each box leading to a second or outer manifold. As appears from my discussion of claim 4, the claim in this respect is narrower than required by the prior art. But since the patentee has voluntarily chosen to accept this limitation for the purposes of this claim, I take it as it is and hold it not infringed by the defendant's construction.

### Claim 11.

This claim calls for "an oil passage for delivering lubricant from the housing (cam follower housing) to the roller" which was indicated in the specifications as mounted in the follower in engagement with the cam. This is a feature of the invention, not discussed above, whereby pressure oil is diverted before it reaches the valve gear and after lubricating various parts is returned to the oil supply through the crank case without passing through the rocker arm boxes at all. The "oil passage" included as an element in this claim is wholly absent

in the defendant's construction. The lubrication accomplished by this feature of Schenk's disclosure the defendant accomplished by splash from a different source. This claim accordingly is not infringed.

### Claim 14.

This claim includes as an element a follower for actuating each valve mechanism.

In the specifications the patentee had shown a cam follower in two parts separated by a spring in an oil chamber included in the circuit leading to the valve gear, the purpose of this arrangement being to create a pumping action between the upper and lower portions of the cam followers and to cushion the action of the valve gear. There is nothing in the language of the claim, however, to indicate whether the combination stated was intended to be limited to the complicated two-piece follower which alone was described in the specifications, or was intended to include any conventional follower.

The defendant contends that the patentee is estopped by the file wrapper to construe the claim broadly to include such a follower as the defendant has used in its corresponding combination, which is not at all the two-piece follower described in the specifications of Schenk's patent.

I am unable to sustain the claim of file wrapper estoppel. Originally the patentee submitted two claims, 15 and 16, covering in some detail the functions supposed to be accomplished by his two-part follower. These two claims were rejected "as lacking any patentable cooperation between the two-part follower and valve stem fuel outlet." Thereafter the patentee amended his specifications in an express attempt to remedy the defect noted by the examiner. He also added new claims 17 to 21. Of the new claims, 17 and 18 made it abundantly clear that the follower therein included was indeed the two-part follower described in the specifications. But although the patentee's attorney observed "New claims 17, 18 *and 19* also clearly bring out the pumping action of the two follower parts", in fact nothing in new claim 19 brought out anything about pumping action or indeed contained anything to suggest that its follower was other than a conventional follower for actuating each valve mechanism. Thereupon the new claims 17 to 21—which had never been rejected—were allowed without comment, new claim 19 becoming claim 14 of the patent as issued. Certainly there was

nothing here to suggest that the claim was allowed only upon the attorney's representation quoted above, within the rule of Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823, cited by the defendant. Especially so, in view of the fact that the quoted observation though true of new claims 17 and 18 was obviously untrue in respect of claim 19, and a sheer inadvertence.

In view of the fact that claims 12 and 13, not here sued upon, are expressly limited to a specified "two-part follower", the absence of such a limitation in claim 14 convinces me that no such limitation was here intended.

This disposes of the only contention put forward by the defendant to make out its defense of non-infringement of this claim. And since the defendant's devices include every element of this combination, I hold the defendant guilty of infringing claim 14.

### Claims 15 and 16.

These claims, like claim 5, make it abundantly clear that the patentee was claiming not broadly a gravity drainage from rocker arm box to sump, but only a limited combination containing his specific disclosure of scavenge pipes leading into an outer, return manifold and thence to the sump. Like claim 5, the scope of these claims also, wholly without reference to the file wrapper, is so limited that a conclusion of non-infringement is required.

### The Reissue.

The new claims of the reissue which are in suit, viz., claims 17 to 20, although not invalid as stating inventions different from the disclosure of the original patent, I must hold void for the laches of the patentee in filing his application for reissue. His own testimony shows that in the spring of 1938 he was first told that his claims were too broad and it was not until December 27, 1938, that his application for reissue was made. No exculpatory circumstances whatsoever for this delay were shown. The delay was therefore fatal, whether the reissue was for broadened claims as I held in Stanley Works v. C. S. Mersick Co., D.C., 34 F. Supp. 913, at page 918, or for narrowed claims as I held in Better Packages, Inc., v. Derby Sealers, Inc., et al., D.C., 43 F.Supp 123, by memorandum entered March 19, 1941.

But quite apart from any question of laches, there are other factors which make

the claims of the reissue unavailable to the plaintiff here. For the plaintiff has vigorously contended throughout this litigation that all the claims added by the reissue were narrowed claims. If this contention be sound, I must hold that the reissue was invalid as being without statutory authority.

For the statute, 35 U.S.C.A. § 64, authorizes a reissue only when the original patent is "wholly or partly inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new * * *". If the patentee in applying for a reissue includes the claims of his original patent without any change in the specifications, as was done here, he is necessarily asserting that the original claims are operative and valid and an assertion that the original was "inoperative" becomes obvious pretense. Nor in such a case can he justify his application for a reissue upon the ground that in the original he claimed "as his own invention or discovery more than he had a right to claim as new", for he is asserting that in the original he did *not* claim too much. It must, therefore, follow necessarily that if the new claims applied for in the reissue are narrower than those of the original patent, there is a fundamental repugnancy in the application for the reissue, which precludes the application as a proper one for allowance. As was observed in Mahn v. Harwood, 112 U.S. 354, 5 S.Ct. 174, 179, 6 S.Ct. 451, 28 L.Ed. 665, where the original claim is too broad, "the public interest is promoted by the change" to a narrowed claim. But the reissue statute does not authorize the inventor to obtain a narrowed claim in the pretense that the original claim was too broad without a surrender of the excessive protection of his original claim.

This dilemna, however, is not necessarily present in applications for broader claims by reissue. Such applications are authorized under the language of the statute on the theory that the original patent was "inoperative * * * by reason of a defective or insufficient specification" if its claims were not broad enough to supply protection for the entire inventive disclosure. Consequently, the new claims of the reissue can be sustained only if, contrary to plaintiff's contention, they are broadened claims. I turn, therefore, to a consideration of that subject, confining my attention to those claims of the reissue which are here relied upon, viz., claims 17 to 20, inclusive.

First of all it will be noticed that in the claims of the reissue, just as in the claims of the original patent, the patentee has not attempted to claim separately and broadly his only novel contribution to the art, viz., the means of draining the oil from the rocker arm boxes and returning it to the circulatory system for the valve gear. Here, too, he has claimed this feature of his disclosure only in combination with numerous other elements and sub-combinations in the cylinder assembly, all old in the art.

Consider first the language of the new claims relating to Schenk's drainage means whereby he specifies drainage by gravity from all the boxes to a sump ("common oil return beneath the crank case") and a scavenge pump to return the oil from the sump to the circulatory system. This language in terms is narrower than that of claims 4 and 14 as I have construed them (though broader than claims 4 and 14 if accorded the construction for which the defendant has contended). And the same language of the new claims is definitely broader than the corresponding language of claims 5, 15 and 16.

Then consider the aspect of the new claims to that language of claims 2 and 3 relating to the lubrication of the valve joint to which I felt constrained to give a narrow construction in considering the question of infringement. Here the language of the new claims is definitely broader. It is broader, I think, than that of claims 4 and 5 and of at least equal breadth with claims 14, 15 and 16.

█ I agree with plaintiff's counsel when he suggests in substance that a claim in a reissue is broadened if it could be infringed by any conceivable device which would not infringe any one of the original claims, and that conversely the claim in a reissue is a narrowed claim if there is any conceivable device which, although infringing one of the original claims, would not infringe the claim in question in the reissue. Thus tested, the claims of the reissue must all be treated as being broadened claims. Fox Typewriter Co. v. Corona Typewriter Co., 6 Cir., 282 F. 502.

█ That being so, the reissue is not invalid because of the inherent repugnancy in making narrowed claims without change in the original claims and specifications. But

'this reasoning brings us unavoidably to the conclusion that the defense of intervening rights must be sustained, for defendant has manufactured its devices ever since 1935, and the reissue was not applied for until 1938 after the patentee had seen commercial specimens of the accused devices.

■ But for all purposes of this case the plaintiffs' rights seem to be the same whether the new claims of the reissue are deemed narrowed or broadened. As we have seen, if the new claims are narrowed ones the reissue is invalid as not coming within the reissue statute. But in that event, the invalidity of the new claims would not taint claims of the original patent otherwise valid. For whatever the rule once was (Cf. Eby v. King, 158 U.S. 366, 15 S.Ct. 972, 39 L.Ed. 1018), under the 1928 amendment of R.S. § 4916, 35 U.S.C.A. § 64, it is provided that "the reissued patent to the extent that its claims are identical with the original patent shall constitute a continuation thereof and have effect continuously from the date of the original patent." Thus it plainly follows that here the claims of the original patent, all of which were carried over into the reissue, were never surrendered.

On the other hand, if the new claims are broadened ones, as I believe, they are unavailing to the plaintiff, no matter against whom asserted, over the defense of intervening rights. For, if I understand aright, the intervening use by this defendant is not personal to this defendant. It can be availed of by any other defendant whom the plaintiff might sue elsewhere upon these claims. At least, such was my holding in Stanley Works v. C. S. Mersick Co., D.C., 34 F. Supp. page 919.

### Miscellaneous Rulings.

On brief, plaintiff asks me to reconsider my ruling excluding Exhibit J for identification. As to this, I am satisfied that my original ruling at the trial was sound and adhere thereto.

■ On trial, after excerpts of the patentee's pre-trial deposition taken at the instance of the defendant had been admitted on the defendant's offer, the plaintiff offered the entire deposition (the patentee having died prior to the trial) and on the defendant's objection thereto I reserved ruling, neither party insisting upon a present ruling, until I could examine the deposition sufficiently to judge of its admissibility.

The defendant's objection is now overruled and the deposition may be deemed a part of the record. For the plaintiff has contended throughout that his complaint states not only a case for patent infringement but also a case for the misuse of confidential information which the defendant was alleged to have received from the patentee in 1930.

■ To be sure, there is no evidence whatever either in this deposition or elsewhere in the record that the defendant made any use of information received from the patentee before the original patent issued in 1931; the infringing devices were not manufactured until after 1934. When the original patent issued, information relating to the invention which it embodied ceased to be confidential; by the issue of the patent such information was published for all the world to see. Thus the total want of proof of a wrongful use by the defendant before the date of issue is fatal to the plaintiff's claimed cause of action therefor. None the less, plaintiff was at least entitled to offer such evidence as he had on this issue, and is entitled to a definite ruling on his offer, even though the ruling is without effect upon the ultimate result.

An interlocutory decree in accordance with this opinion and my conclusions of law this day entered may be submitted by the plaintiff, on seven days' notice unless its form can be agreed upon.